UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------x

CURTIS ARATA,[1] individually and on
behalf of all others similarly
situated,

                Plaintiff,

          -against-

STANDARD LITHIUM LTD., ROBERT
MINTAK, KARA NORMAN, and
ANDREW ROBINSON,

                Defendants.

------------------------------------x

**MEMORANDUM & ORDER**
22-CV-507(EK)(VMS)

ERIC KOMITEE, United States District Judge:

        Standard Lithium is a Canadian company whose shares trade on the TSX Venture Exchange in Canada and the NYSE American Exchange.  The company has attempted to commercialize a process for extracting lithium from salt water and refining it into lithium carbonate, for use in various products such as lithium-ion batteries.

        In 2019, Standard Lithium built a pilot lithium extraction plant in Arkansas.  The plant began operations in May 2020.  Throughout 2020 and 2021, the company described, in press

---

[1] Curtis Arata has replaced James Gloster as the named plaintiff in this action.  *Compare* Am. Compl. ¶ 19, ECF No. 27 (Arata as named plaintiff), *with* Compl. 1, ECF No. 1 (Gloster as named plaintiff).  The Clerk of Court is respectfully directed to amend the caption of this case to reflect the new named plaintiff.

releases and financial statements, the successful operations of
the plant and the novel nature of the lithium-extracting
technology implemented there.

According to plaintiff Curtis Arata, however, two
research firms would later put the lie to these statements.  In
November 2021, a short seller called Blue Orca Capital published
a report asserting that Standard Lithium had overstated the
progress of operations at the Arkansas plant and the viability
of its technology.  Standard Lithium's shares fell by nearly
nineteen percent after publication.  A few months later, another
short seller — provocatively named Hindenburg Research —
published another report disputing the novelty of Standard
Lithium's technology.  Standard Lithium's shares then fell
nearly twenty-seven percent.

Plaintiff Arata, who first purchased Standard
Lithium's common shares in October 2021, brought this
securities-fraud action on behalf of himself and a putative
class of similarly situated shareholders who purchased Standard
Lithium shares on the NYSE American or an over-the-counter
marketplace called OTCQX.  He alleges that Standard Lithium
overstated its production capabilities, misrepresented its
progress toward achieving "proof of concept" for its brine
extraction process, and wrongly described its technology as
novel and proprietary.  In addition to Standard Lithium, Arata

sues Robert Mintak, Standard Lithium's CEO during the relevant period; Kara Norman, its CFO during the relevant period; and Andrew Robinson, its COO.

The complaint asserts two causes of action under the Securities Exchange Act of 1934 (the "Exchange Act"): first, a violation of Section 10(b) and Rule 10b-5 against all defendants, and second, a violation of Section 20(a) — which establishes controlling-person liability — against Mintak, Norman, and Robinson.  The defendants now move to dismiss the complaint in its entirety, contending (among other things) that it does not adequately allege the falsity of the asserted misrepresentations and omissions, the scienter of the individual defendants, or loss causation.

For the reasons set forth below, the motion is granted, and the amended complaint is dismissed.

## I.    Background

The facts described herein are taken from the amended complaint, as well as "statements or documents incorporated into the complaint by reference" and "legally required public disclosure documents filed with the SEC," which are properly considered at the motion to dismiss stage.  *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).[2]  They

---

[2] Unless otherwise noted, when quoting judicial decisions this order accepts all alterations and omits all citations, footnotes, and internal quotation marks.

are assumed to be true for purposes of the defendants' motions to dismiss.

The complaint relies extensively on statements from the two short-seller reports.  A court may consider allegations based on short-seller reports at the motion-to-dismiss stage. *Sask. Healthcare Emp.'s Pension Plan v. KE Holdings Inc.*, 718 F. Supp. 3d 344, 382 (S.D.N.Y. 2024).  Like any other allegation, however, an allegation transplanted from a short-seller report must be supported by sufficient factual content to state a plausible claim.  *Sask. Healthcare*, 718 F. Supp. 3d at 382; *see also In re Hebron Tech. Co. Sec. Litig.*, No. 20-CV-4420, 2021 WL 4341500, at *13 (S.D.N.Y. Sept. 22, 2021) ("The issue in each case is whether the allegations in the complaint, taken as a whole, state a claim.").  Of course, a publishing short seller will have an "obvious motive to exaggerate the infirmities of the securities" at issue, given its financial interest in the security's price declining.  *In re EHang Holdings Ltd. Sec. Litig.*, 646 F. Supp. 3d 443, 459 (S.D.N.Y. 2022).  Thus, courts will "critically analyze" a short-seller report's allegations to determine if they are "reliable as opposed to fabricated based on self-interest."  *Id.*

A.   **Standard Lithium's Extraction Process and Arkansas Demonstration Plant Project**

Standard Lithium Ltd. — hereinafter Standard Lithium or the "Company" — is in the business of extracting lithium from brine (that is, salt water). Am. Compl. ¶¶ 2, 29. Industry participants call this direct lithium extraction ("DLE"). *Id.* ¶ 2. During the class period, Standard Lithium used a "proprietary" DLE process called "LiSTR" to extract lithium from brine, which it then converted into lithium carbonate using another technology called "SiFT." *Id.* ¶¶ 2, 28, 38.

In May 2018, Standard Lithium commissioned a lithium extraction demonstration plant (the "Demonstration Plant," or "Plant") in Southern Arkansas, in a region called the Smackover Formation. *Id.* ¶¶ 35-36. The Company commissioned the Demonstration Plant pursuant to a memorandum of understanding with LANXESS, a German chemical company. *Id.; see also* 2021 Annual Information Form 8, ECF No. 33-4. The Plant was one of the first steps in a "phased process towards developing commercial opportunities relating to the production, marketing and sale of battery grade lithium products" from brine in the Smackover Formation. 2021 Annual Information Form 8.

Several months later, in November 2018, Standard Lithium and LANXESS signed a term sheet for "a contemplated joint venture." Am. Compl. ¶ 36. As part of the JV (the

"LANXESS Project"), LANXESS would contribute "lithium extraction rights" it owned in the Smackover Formation, along with "access to its existing infrastructure" and brine.  *Id.* ¶¶ 35-36. Standard Lithium would, in turn, contribute the Demonstration Plant, its own "existing rights and leases in the Smackover Formation" and its LiSTR extraction process.  *Id.* ¶ 36.  If Standard Lithium successfully demonstrated "proof of concept" (a term that, as far as the complaint tells us, Standard Lithium's disclosures do not define), LANXESS would fund commercial development of the LiSTR project.[3]  *Id.* ¶ 37; 2020 Annual Information Form 10, ECF No. 33-6.

        The complaint's description of what happened next is jargon heavy.  In early 2019, Standard Lithium conducted "minipilot scale process work . . . to provide data for the design of the full-scale Demonstration Plant."  *Id.* ¶ 38.  The complaint does not explain what the phrase "minipilot scale process work" means.  By mid-October 2019, the Company had completed the "initial installation" of the Demonstration Plant, though the complaint largely leaves that term, too, unexplained. *Id.*  In any event, in August of that year, Standard Lithium announced that Worley (an engineering firm) had awarded the LANXESS Project a "favorable" preliminary economic assessment

_____

[3] This funding would be subject to certain additional conditions, including due diligence and studies as to the project's economic viability. Am. Compl. ¶ 37.

("PEA").  *Id.* ¶ 39.  This assessment was predicated, in part, on the "assumption" that Standard Lithium would achieve a recovery rate of "about 90%."  *Id.* ¶ 38.  The PEA concluded that the Project would have a net present value of just under $1 billion, assuming certain conditions (including the assumed recovery rate) were satisfied.  *Id.* ¶¶ 39-40.

**B.    Standard Lithium's Claimed Progress and Fundraising**

On May 19, 2020, Standard Lithium announced in a press release "that it had successfully commenced operations at the Demonstration Plant" during the first part of that year.  *Id.* ¶ 41.  That press release touted the "successful start-up" of the Demonstration Plant, hailing it as a "significant milestone towards achieving proof of concept" of the Company's "proprietary" LiSTR technology.  *Id.* ¶¶ 41-42.

Two additional statements in the May press release figure prominently in the instant dispute.  The release claimed that the LiSTR process "[v]astly increases recovery efficiencies to *as much as >90%*."  *Id.* ¶ 80.  (There is some tension, of course, inherent in placing the "greater than" symbol immediately after the phrase "as much as.")  The press release also stated that, because the Demonstration Plant was "designed to continuously process an input tail brine flow of 50 gallons per minute," the Plant could produce "between 100-150 [tons]" of lithium carbonate per year.  *Id.*

7

In the months following the May release, Standard Lithium documented the Demonstration Plant's progress toward establishing proof of concept. As noted above, this was an important milestone because it could help unlock funding for the LANXESS Project. In a September press release, Robinson said the Company had been "successfully operating our first-of-its-kind industrial scale DLE plant," and had been "continuously making lithium chloride product for months." *Id.* ¶ 96.

Then, on December 3, 2020, Standard Lithium claimed the Demonstration Plant had achieved "start-to-finish proof of concept of its modern lithium processing technology." *Id.* ¶¶ 48–49; *see also* December Press Release, ECF No. 33-5. The release defined this achievement as containing three elements. The Demonstration Plant had (1) "directly extracted lithium from brine in Arkansas," and (2) "produced a purified, concentrated intermediate product," which was then (3) "converted to better than battery quality lithium carbonate" at a separate SiFT plant in Canada. December Press Release 1. "This proof of concept," the release quoted Robinson as saying, "validate[d] [the Company's] approach." *Id.* at 4.

Market participants reacted favorably to the December 3 announcement. On December 7, H.C. Wainwright gave Standard Lithium a "buy" rating, noting the "unquestionable success of [its] proof of concept." *Id.* ¶ 50. Cannacord

Genuity initiated coverage of Standard Lithium on January 11, 2021, and projected that the LANXESS Project was "imminent." *Id.* ¶ 51.  And in a report dated January 18, Roth Capital Partners predicted an "official signing" of the LANXESS Project agreement.  *Id.* ¶ 53.  Between December 2 and January 19, the Company's share price rose seventy percent from $1.93 to $3.29.[4]

Around the same time, Standard Lithium announced and conducted a public offering of common shares on the TSX Venture Exchange in Canada.  *Id.* ¶¶ 54-55.  The Company indicated its intent to use the offering proceeds to fund efforts at the LANXESS Project.  *Id.*  The Company's shares began trading on the NYSE American exchange more than six months later, on July 13, 2021.  *Id.* ¶¶ 8, 56-58.  Before that date, the Company's share had traded on a U.S.-based over-the-counter marketplace called OTCQX.  *Id.* ¶ 8.

## C.    "Corrective Disclosures" and Stock-Price Declines

Blue Orca published its report on November 18, 2021.  Plaintiffs' complaint quotes this report extensively, for approximately three full pages.  *Id.* ¶ 60.  Blue Orca claimed that data Standard Lithium had filed with an Arkansas regulatory body — specifically, the Arkansas Oil and Gas Commission, or

---

[4]  *See Standard Lithium Ltd. (SLI)*, Yahoo Finance, https://finance.yahoo.com/quote/SLI/history (last visited September 3, 2025). The Court "may take judicial notice of well-publicized stock prices," even if such prices were not mentioned in (or appended to) the complaint.  *See Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 166 n.8 (2d Cir. 2000).

"AOGC" — undermined Standard Lithium's recovery-rate and proof-of-concept claims. *Id.* ¶ 60.

Blue Orca asserted, based on its review of the AOGC-filed data, that the Demonstration Plant had recovery rates "significantly lower" than the ninety-percent rate Standard Lithium had touted in its May 2020 press release. *Id.* The short seller added that the Company's recovery rate was trending in the wrong direction, actually *declining* over time. *Id.* By Blue Orca's arithmetic, Standard Lithium had "achieved an average lithium recovery rate of just 13%" over the preceding twelve months. *Id.*

Blue Orca also cited AOGC data in support of its assertion that the Demonstration Plant had produced "just 66 pounds of lithium carbonate" after eighteen months of operations. *Id.* ¶ 66-67; Blue Orca Report 1, ECF No. 33-1. The report concluded that Standard Lithium's technology was "neither economically viable nor scalable." Blue Orca Report 1. Standard Lithium's stock price fell almost nineteen percent on the day of the report's publication, closing at $8.01 (in U.S. dollars). Am. Compl. ¶ 62.

In response, Standard Lithium issued a press release that same day. *Id.* ¶ 63. It asserted that Blue Orca's calculation of lithium recovery rates was incorrect because it was based on incomplete information. Per the Company, the AOGC

10

data reflected only a portion of lithium chloride solution that it had recovered — the portion it had "temporarily stored on . . . site."  November Press Release 5, ECF No. 33-3.  As a result, the AOGC reports did not include the "much large[r] volume" of lithium chloride solution that the Demonstration Plant processed but then reinjected back into the brine formation.  *Id.*

On February 3, 2022, Hindenburg published its report. Hindenburg, too, disparaged Standard Lithium's technology, claiming that it was based on three patent applications purchased from a "one-man engineering shop," two of which had been deemed unpatentable by the U.S. Patent and Trademark Office.  Am. Compl. ¶¶ 75-76.  The report went on to challenge Standard Lithium's claim that "proof of concept" had been achieved.  In fact, Hindenburg wrote, LANXESS had "admit[ted] that Standard's extraction technology has still not demonstrated proof of concept."  *Id.* ¶ 77.  Following publication of the Hindenburg report, the company's share price fell twenty-seven percent, closing at $5.29 per share.  *Id.* ¶ 79.

**D.   This Putative Class Action**

Another named plaintiff, James Gloster, filed this putative class action in January 2022.  ECF No. 1.  In June 2022, an amended complaint replaced Gloster as the named plaintiff with Arata.  Am. Compl. 1.  The amended complaint

defines the putative class to include "all persons and entities
that purchased or otherwise acquired Standard Lithium common
stock on the OTCQX between May 19, 2020 and July 12, 2021, and
between July 13, 2021 and February 3, 2022, on the NYSE,
inclusive, and who were damaged thereby." *Id.* ¶ 201.

## II.  Legal Standard

To overcome a Rule 12(b)(6) motion, a plaintiff must
plead factual allegations sufficient "to state a claim to relief
that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550
U.S. 544, 570 (2007).  A claim is plausible "when the plaintiff
pleads factual content that allows the court to draw the
reasonable inference that the defendant is liable for the
misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678
(2009).  The Court must accept all factual allegations in the
complaint as true and draw all reasonable inferences in the
plaintiff's favor. *See Lundy v. Catholic Health Sys. of Long
Island Inc.*, 711 F.3d 106, 113 (2d Cir. 2013).

Securities fraud cases are also subject to the
"heightened pleading requirements" of both Federal Rule of Civil
Procedure 9(b) and the Private Securities Litigation Reform Act
("PSLRA"). *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 166
(2d Cir. 2021).  Rule 9(b) requires a party to "state with
particularity the circumstances constituting fraud." Fed. R.
Civ. P. 9(b).  "Allegations that are conclusory or unsupported

by factual assertions are insufficient." *ATSI Commc'ns*, 493 F.3d at 99.  The PSLRA further requires a plaintiff to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1)(B).

Thus, plaintiffs "must do more than say that the statements were false and misleading; they must demonstrate with specificity why and how that is so." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014).

## III. Discussion

Under Section 10(b) of the Exchange Act (as implemented by Rule 10b-5), it is unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5.  Section 10(b) and Rule 10b-5 only apply to "transactions in securities listed on domestic exchanges[] and domestic transactions in other securities." *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 267 (2010).

To state a Rule 10b-5 claim, a plaintiff must demonstrate: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 157 (2008).

## A.    Domesticity Under *Morrison*

Standard Lithium first asserts that any claims arising from the period prior to its NYSE American listing — *i.e.*, from May 19, 2020, to July 12, 2021, *see* Am. Compl. ¶ 1 — must be dismissed because the plaintiff has not adequately alleged that Standard Lithium trades on OTCQX were "domestic" transactions.

A transaction is domestic if (1) it involves "securities listed on domestic exchanges," or (2) "domestic transactions in other securities." *Morrison*, 561 U.S. at 267. Plaintiff argues that he adequately pleaded both options, though (a) he makes this argument half-heartedly and without much in the way of citation to the complaint itself, and (b) he purchased shares only on the NYSE American exchange. *See* Arata Purchase Cert., ECF No. 15-2.

### 1.    "Domestic Exchange"

The complaint does not allege that OTCQX is an exchange — only that it is a marketplace "for over-the-counter

trading of stocks in the United States."  Am. Compl. ¶ 21.  In opposing dismissal, however, Arata writes that OTCQX is "an *over-the-counter exchange* based in the U.S."  Pl.'s Opp'n Br. 10 n.8, ECF No. 34 (emphasis added).  The italicized language is an oxymoron of sorts: "over-the-counter transactions are, by definition, those that do not occur on an exchange."  *In re Petrobras Sec. Litig.*, 150 F. Supp. 3d 337, 340 (S.D.N.Y. 2015).

Plaintiff does not meaningfully contest the exchange / over-the-counter dichotomy, or its application to OTCQX. Instead, he argues that the defendants' domesticity argument should be tabled until the class-certification stage.  At the pleading stage, he contends, there "is no question" that the sole named plaintiff — Arata, who bought shares on NYSE American — "purchased in a domestic transaction under *Morrison*."  Pl.'s Opp'n Br. 11.  On this view, the defendants' arguments about OTCQX go to Arata's adequacy and typicality as a class representative under Federal Rule of Civil Procedure 23(a), not to whether he has stated a claim under Rule 12(b)(6).  The defendants reply that *Morrison*'s requirement of a purchase or sale of securities *in the United States* is a pleading requirement, and that the OTCQX portion of the complaint alleges "claims that fall outside the reach of U.S. securities laws." Defs.' Reply Br. 1 & n.2, ECF No. 35.

*Morrison*'s domesticity requirement is indeed a pleading requirement. 561 U.S. at 267 (it is "only transactions in securities listed on domestic exchanges, and domestic transactions in other securities, to which § 10(b) applies"). And the defendants are correct on the merits: OTCQX is not a domestic "exchange." *Petrobras*, 150 F. Supp. 3d at 340. Arata brought claims on behalf of two sets of purchasers who bought in two different venues over two different periods. Am. Compl. ¶ 1. One set (the OTCQX set) has not stated a claim.[5]

2. "Domestic Transactions" Off-Exchange

The complaint also falls short of alleging a domestic transaction that occurred off exchange. An off-exchange transaction is "domestic" when "irrevocable liability is incurred or title passes within the United States." *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 67 (2d Cir. 2012). The complaint alleges that OTCQX "is the top tier of the three marketplaces for the over-the-counter trading of

---

[5] Rule 12(b)(6) motions are generally directed at "a single count or claim for relief," if not a complaint in its entirety, rather than just a "part of a claim." *See* 5B Charles Wright & Arthur Miller, *Federal Practice and Procedure* § 1358 (4th ed.). Still, district courts in this circuit have frequently "granted motions to dismiss with respect to some" allegations in securities fraud complaints, even without dismissing an entire claim. *In re ITT Educ. Servs., Inc. Sec. Litig.*, 34 F. Supp. 3d 298, 301 & n.1 (S.D.N.Y. 2014) (dismissing "with respect to some allegedly misleading statements while allowing claims as to other statements to proceed"); *In re Vale S.A. Sec. Litig.*, No. 19-CV-526, 2020 WL 2610979, at *19 (E.D.N.Y. May 20, 2020) (setting out, in an appendix, lists of "actionable" and "inactionable" statements).

stocks in the United States," and that companies listed on it are "subject to SEC regulation." Am. Compl. ¶ 21. In his brief, Arata cites the OTCQX website for the unremarkable proposition that the platform "provides a market for foreign listed companies to access U.S. investors." Pl.'s Opp. Br. 10 n.9. None of this comes close to satisfying *Morrison* or *Absolute Activist*.

This pleading shortfall is somewhat surprising. Had plaintiff asserted his claims on behalf of U.S. purchasers, rather than all "persons and entities that purchased or acquired" Standard Lithium stock during the specified periods, the outcome might be different on this issue. For such U.S. purchasers, it is likely that *both sides* of the "irrevocable liability" that *Absolute Activist* requires would be in the United States. When a purchaser buys stock on OTCQX, his or her counterparty is not the ultimate seller of the shares in question, but rather a U.S.-based clearinghouse.[6] The complaint

---

[6] The over-the-counter trading of equities is different from other securities in this regard, in a manner that may have important implications for *Morrison's* domesticity analysis. *Morrison's* dichotomy between on- and off-exchange trading is presumably relevant to the location of the purchase and sale because, with a centralized exchange, irrevocable liability always passes at the exchange itself. In contrast, in classic over-the-counter trading, there is no central hub; instead, market participants trade directly with one another, and at least one of the parties may be located abroad. *See Petrobras*, 150 F. Supp. 3d at 340. In equities trading, however, a purchaser's liability does not run to the seller, but rather to a central clearinghouse like NSCC — even in over-the-counter trading through a platform like OTCQX. *See generally* Paolo Saguato, *The Ownership of Clearinghouses: When "Skin in the Game" Is Not Enough, The Remutualization of Clearinghouses*, 34 Yale J. on Regul. 601, 608-13 (2017) (providing an overview of the role of clearinghouses in securities trading).

is *not* restricted to U.S. purchasers, however, and the plaintiff has not argued that the OTCQX purchases at issue were domestic transactions.  The claims based on OTCQX purchases thus cannot survive (though the Court nevertheless addresses them in its falsity analysis below).

**B.  Materially False and Misleading Misrepresentations or Omissions**

The complaint alleges that dozens of Standard Lithium's statements and omissions were false or misleading. Am. Compl. ¶¶ 80-178.  The alleged misrepresentations fall into four main categories: (1) statements about the recovery rates and production capabilities of Standard Lithium's technology, (2) statements about the Demonstration Plant's achievement of "proof of concept" for lithium extraction, (3) statements about the scalability and commercial viability of the LiSTR process, and (4) statements describing LiSTR as "novel," "proprietary," and "protected by a series of patent applications." *See, e.g.*, *id.* ¶¶ 80, 164.  The Court addresses each category of statements in turn.

1.  Statements About Recovery Rates and Production
    <u>Capabilities</u>

Arata first alleges that Standard Lithium's statements about the performance of the Demonstration Plant were false or misleading.  Relying on the Blue Orca Report, he challenges Standard Lithium's ostensible claims that (1) the Demonstration

18

Plant's lithium recovery rate was around ninety percent, and (2)
the Plant was producing lithium carbonate at a rate of 100-150
tons per year.[7] *See id.* ¶¶ 60, 81.  Arata contrasts these claims
with Blue Orca's assertion (based on AOGC data) that the
Demonstration Plant's average recovery rate was closer to
thirteen percent, and that it had only produced sixty-six pounds
of lithium carbonate in the preceding eighteen months.  Blue
Orca Report 1.

      These claims fail for two reasons, as set out in
greater detail below.  First, Standard Lithium never said the
Demonstration Plant was achieving a ninety-percent recovery rate
or producing 100-150 tons of lithium carbonate per year.
Second, even if Standard Lithium had made those claims, Blue
Orca's calculations would not necessarily have falsified them.
Before we reach the question of falsity, however, we pause to
address the defendants' claim that the AOGC data cannot support
a claim of falsity because that information was in the public
domain.

---

      [7]  In addition to the May 19 press release, Am. Compl. ¶ 80, these
statements appeared in several subsequent releases and SEC filings.  For
instance, a September 2020 press release also stated that the LiSTR process
offered "90% recovery" rather than the "40-60%" offered by "conventional
methods."  *Id.* ¶ 98.  Meanwhile, another September 2020 press release
repeated the annualized "100-150 tons" statement.  *Id.* ¶ 94.  So did a June
2021 Form 40-F filing.  *Id.* ¶ 128.

a.    Defendants' argument that the information was in the public domain fails at this stage.

As a preliminary matter, the defendants argue that the AOGC data on which Blue Orca based its calculations was already public, such that the Company's failure to disclose that data cannot have rendered its statements false or misleading.  Defs.' Br. 15-16, ECF No. 32; *see also* Am. Compl. ¶ 60 (describing AOGC data as publicly available).  That argument is easily dispensed with here.

In a private civil action under Section 10(b), we consider the issue of public availability under the rubric of the "truth on the market" doctrine.  *E.g.*, *SEC v. Honig*, No. 18-CV-8175, 2020 WL 906383, at *6 (S.D.N.Y. Feb. 25, 2020).  That doctrine — a corollary to the familiar "fraud on the market" theory — holds that an alleged "misrepresentation is immaterial" when the truth of the matter in question "is already known to the market."  *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000).

The truth-on-the-market defense, however, is "intensely fact-specific" and will "rarely" be an appropriate basis on which to dismiss a Section 10(b) claim at the pleading stage.  *Id.*  Moreover, it is not enough for a defendant to argue that it had no duty to disclose a piece of information, simply because that information was drifting somewhere in the vast

universe of publicly available information.  *E.g.*, *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 718 (2d Cir. 2011) (rejecting the "sweeping proposition that an issuer of securities is never required to disclose publicly available information").  Instead, a defendant must demonstrate that a piece of information was "conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements."  *Ganino*, 228 F.3d at 167; *cf. In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 377-78 (E.D.N.Y. 2003) (information must be "*readily accessible* in the public domain"(emphasis added)).[8]

The AOGC data does not, at this stage, come close to meeting that standard.  The complaint contains no allegations concerning the visibility of the AOGC website to the investing

---

[8]  Courts applying the truth-on the-market doctrine have held that it applies only to "affirmative misstatements" rather than omissions.  *See In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 577 (S.D.N.Y. 2013).  But the distinction between the two categories is often fuzzy: a misleading statement is definitionally one that "omits the truth."  *In re Smith Barney Transfer Agent Litig.*, 290 F.R.D. 42, 47 (S.D.N.Y. 2013).  Thus, "in most securities fraud cases, an affirmative misstatement can be cast as an omission and vice versa."  *Id.*; *accord Wilson v. Comtech Telecomms. Corp.*, 648 F.2d 88, 93 (2d Cir. 1981) ("The labels by themselves, therefore, are of little help.").  Here, it is not entirely clear whether the plaintiff challenges Standard Lithium's purported statement that the Demonstration Plant was achieving a ninety-percent recovery rate as (1) affirmatively false, or (2) misleading in light of the omission to disclose at some later point that the rate was not being realized.  Because the first option is a plausible one, the Court declines to delve into the "futile logomachical exercise" of distinguishing affirmative misstatement from omission at this stage.  *Smith Barney*, 290 F.R.D. at 47.

public.[9]  *See Honig*, 2020 WL 906383, at *7 (Wikipedia page could not satisfy truth-on-the-market doctrine without "any evidence of promotion" of the page in question).  And, importantly, the defendants do not claim that the ostensible thirteen-percent recovery rate was *itself* available on the AOGC website. Instead, they assert only that an investor could *extrapolate* that rate from public data.  Put differently, the underlying "truth of the matter," *Ganino*, 228 F.3d at 167, was at most a *derivative* of information ostensibly available to the public — and a complex one to calculate, at that.

Thus, the Court will not endorse, at this stage, Standard Lithium's argument that the AOGC data was readily accessible to the public or necessarily impounded into the stock's price.  *Alpha Cap. Anstalt v. New Generation Biofuels, Inc.*, No. 13-CV-5586, 2014 WL 6466994, at *9 (S.D.N.Y. Nov. 18, 2014) (taking similar approach); *but see Rice v. Intercept Pharms., Inc.*, No. 21-CV-0036, 2022 WL 837114, at *10 (S.D.N.Y.

---

[9] Standard Lithium notes that it told investors about AOGC in its public disclosures.  Defs.' Br. 9 & n.6.  This is true enough.  The PEA noted that Standard Lithium had to produce data to AOGC for purposes of determining a royalty rate to landowners.  *See* Preliminary Econ. Assessment 42-43, ECF No. 33-7.  And a quarterly disclosure document from November 2019 stated, when summarizing the information in a LANXESS report on the Smackover Formation, that AOGC data was "on-line and easily searchable."  Management's Discussion & Analysis for Period Ending September 2019, at 12, ECF No. 33-9.  But that is insufficient, at this stage, both for the reasons set out above and also, importantly, because the accuracy of Blue Orca's calculations from the AOGC data remains disputed.  In the end, Standard Lithium cannot have it both ways — arguing on the one hand that everyone should have been able to do what Blue Orca did to identify the alleged overstatement in recovery rates, and on the other hand that Blue Orca's work makes no sense.

Mar. 21, 2022) (adverse reaction information in FDA database was sufficiently available to the public, even though the database contained only "raw data" files that could not be searched without "familiar[ity] with [the] creation of relational databases").

      b.    Standard Lithium never said it was achieving a certain recovery rate or production quota.

Arata has not adequately alleged the falsity of Standard Lithium's statements about the Demonstration Plant's performance. Here, Arata's allegations proceed from a flawed premise: Standard Lithium *never said* the Plant had achieved a ninety-percent recovery rate, or that it was producing 100-150 tons of lithium carbonate per year.

***Recovery Rates.*** Beginning with the recovery rate, Standard Lithium said the Demonstration Plant was using LiSTR technology, and that a "key feature" of the technology was that it "[v]astly increase[d] recovery efficiencies to as much as >90%." Am. Compl. ¶ 80 (excerpting May press release). But read in context, this was a statement about the potential capabilities of the Plant's technology, not a statement about the Plant's actual performance. Indeed, the Company never represented that the ninety-percent figure was derived from the Demonstration Plant's operations. Rather, as at least one of its annual reports made clear, the ninety-percent figure stemmed

from "bench scale" testing and had "not yet been commercially proven." *See* 2020 Annual Information Form 18-19.  In other words, Standard Lithium disclosed to investors that the ninety-percent figure was based on laboratory-scale testing, and never said this figure had been achieved at the Plant.

At bottom, then, the statements in the complaint reveal only that Standard Lithium told investors that the Demonstration Plant was using LiSTR (which Arata does not dispute), Am. Compl. ¶ 80, and that LiSTR had demonstrated a ninety-percent recovery rate under non-commercial laboratory conditions (also not disputed).  *Id.*  Because Arata does not contest the veracity of *those* claims, he cannot allege that these statements about the Demonstration Plant's ongoing operations were false or misleading.

*Production Capabilities.*  Arata also mischaracterizes what Standard Lithium said about the production capabilities of the Demonstration Plant.  Contrary to the complaint's implication, Standard Lithium did not say that the Demonstration Plant was producing (or would produce) 100-150 tons of lithium carbonate per year.  *Contra id.* ¶ 95.  Rather, it said the Demonstration Plant was "designed" to process brine at a certain per-minute rate, and that this was "equivalent to an annual production of between 100-150 [tons]" of lithium carbonate. *E.g.*, *id.* ¶ 94 (emphasis added).  This is not the same as saying

24

the Plant had reached, or would reach, that production target. *See, e.g.*, *Hawes v. Argo Blockchain plc*, No. 23-CV-7305, 2024 WL 4451967, at *7 (S.D.N.Y. Oct. 9, 2024) ("[S]aying that something is 'designed' to achieve certain goals does not either expressly or impliedly guarantee that those goals will be achieved.").

Arata does not dispute that the Demonstration Plant was "designed" to process any certain amount of brine per minute. He simply complains that the Demonstration Plant was not, in fact, achieving an outcome within its design parameters. *Id.* ¶ 95. Because Standard Lithium never said the Plant was doing so, Arata has not plausibly alleged that statements about the Demonstration Plant's annualized production were false or misleading. *See Hawes*, 2024 WL 4451967, at *7.

Arata contests other stray comments in Standard Lithium's public statements about the performance of the Demonstration Plant, but those are non-actionable puffery. A "subjective statement[] that cannot be proven true or false" cannot form the basis of a fraud action. *MacNaughton v. Young Living Essential Oils, LC*, 67 F.4th 89, 96 (2d Cir. 2023). Here, Standard Lithium described the operation of the Demonstration Plant as a (among other things) a "major advance," *id.* ¶ 82, a "significant stride[]," *id.* ¶ 92, and a "key project milestone[]." *Id.* These are "classic examples of puffery." *Schaeffer v. Nabriva Therapeutics plc*, No. 19-CV-4183, 2020 WL

7701463, at *9 (S.D.N.Y. Apr. 28, 2020) (labeling statement that company had achieved "another major milestone" as puffery, and collecting similar cases).

        c.    Even if Standard Lithium had made the challenged statements, the Blue Orca Report did not plausibly falsify them.

Even if we were to construe Standard Lithium's statements as claiming a certain recovery rate and production quota, Arata's claim would still fail. Arata's complaint does not plausibly allege *why* such statements (if they had been made) would be false or misleading. This is because his allegations as to the falsity of these claims are internally inconsistent.

A court "need not accept as true an allegation that is contradicted by documents on which the complaint relies." *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 555 (S.D.N.Y. 2004). Here, Arata relies on the Blue Orca Report's finding of a thirteen-percent (rather than ninety-percent) recovery rate. Am. Compl. ¶ 60. The Blue Orca Report's recovery-rate calculations also underpin Arata's challenge the Company's ostensible production-quota statement: if Standard Lithium was not achieving a ninety-percent recovery rate, it could not possibly hit the 100-150 tons target, because it would not be extracting enough lithium chloride.

Crucially, however, Arata also relies on the allegations in the Hindenburg Report, the entirety of which —

all fifty-one pages — the Court may deem incorporated.  *See id.*
¶¶ 76-77 (extensively quoting Hindenburg Report); *Trump v.
Vance*, 977 F.3d 198, 210 n.8 (2d Cir. 2020) (where complaint
makes "clear, definite, and substantial reference" to a
document, the court may consider the entire document).  And
Hindenburg contradicts Blue Orca on this point: it credits
Standard Lithium's claim that Blue Orca's calculations are wrong
because they disregard vast quantities of lithium chloride that
the Company had produced and reinjected back into the brine
aquifer.  Hindenburg Report 47.  So, Arata's sprawling
allegations — which rely so extensively on the short sellers —
are internally contradictory.

Given this tension, the Court need not (and cannot)
credit Arata's allegations (derived from Blue Orca) regarding
the falsity of Standard Lithium's purported statements about the
Demonstration Plant's operations.  *See In re Bristol-Myers
Squibb Sec. Litig.*, 312 F. Supp. 2d at 555 (court need not
accept allegations "contradicted by documents on which the
complaint relies").  The claim therefore fails as to those
statements, even assuming Standard Lithium had made those
statements in the first place.

2.  Statements About Proof of Concept

Arata also challenges Standard Lithium's December 2020
claim that the Demonstration Plant had achieved proof of

27

concept.  In response to the Court's question at oral argument, Arata's counsel stated that this was the most plainly false statement alleged in the entire complaint.  Oral Arg. Tr. 36:4-11, ECF No. 42.  The Court disagrees.

Standard Lithium touted the proof-of-concept achievement virtually throughout the December press release. December Press Release 2-3.  The release's long title began: "Standard Lithium Successfully Completes Proof-of-Concept of Modern Lithium Extraction and Crystallization . . . ."  *Id.* at 1.  Immediately below that, in a section titled "Highlights," the second bullet point read: "Successful proof-of-concept of modern lithium processing technology."  *Id.*  Then, the opening paragraphs of the release stated that the company had "successfully completed the start-to-finish proof of concept of its modern lithium processing technology," which "culminat[ed]" in converting lithium chloride into lithium carbonate at the SiFT plant in Canada.  *Id.*

Arata says the proof-of-concept claim was false, primarily because:

- the Company's efforts at the Demonstration Plant had "yielded just 44 pounds of lithium carbonate, nowhere near the 100-150 [tons] per annum repeatedly represented";

- the Company was "achieving far below a 90% lithium recovery rate," as shown by the Blue Orca Report, and;

- the Company "had no reasonable basis to claim that its LiSTR technology could" achieve the recovery rate or annual production levels mentioned above.

Am. Compl. ¶ 116. He also points to the Blue Orca Report's assertion that proof of concept was "critical" for Standard Lithium because it would unlock joint-venture funding from LANXESS. Blue Orca Report 1; *see also* Am. Compl. ¶ 192.

Arata has not plausibly alleged the falsity of the proof-of-concept claim, for the straightforward reason that the Company had not defined "proof of concept" with any precision before issuing the December release.[10] *See Kuriakose v. Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168, 183 (S.D.N.Y. 2012) (Freddie Mac's public use of the word "subprime" did not give rise to liability where that term had no "universally accepted definition," and where employees adopted "changing internal definitions" of the term). Contrary to Arata's suggestion, *id.* ¶ 5, Standard Lithium never defined "proof of concept" to include a ninety-percent recovery rate or a particular production quota — not in the December press release, and not in any other prior statement.

The Company did, however, appear to define "start-to-finish" proof of concept in the December release. The best reading of that release is that it explains the three elements

---

[10] At least one district court has described the phrase "proof of concept" as a "vague" term that cannot be objectively falsified. *See Jackson v. Fischer*, 2015 WL 1143582, at *6-8 (D. Ariz. Mar. 13, 2015).

of "start-to-finish" proof of concept.  Immediately after the
opening sentence touts "start-to-finish proof of concept," the
second sentence expounds on three elements of that phrase: (1)
direct lithium extraction, (2) conversion to an "intermediate"
product, and (3) conversion of that product to lithium
carbonate.  December Press Release 1.  The press release never
mentions a ninety-percent recovery rate or an annual production
target as essential prerequisites to "start-to-finish proof of
concept."  And because Arata does not dispute that the three
criteria the release *does* mention were in fact met, he cannot
argue that the December release was false or misleading.[11]  *See*
*Gagnon v. Alkermes PLC*, 368 F. Supp. 3d 750, 767 (S.D.N.Y. 2019)
(pointing to surrounding sentences in Form 10-K to define the
phrase "customary pharmaceutical company practices," and
concluding that "[a]gainst this backdrop, the challenged
statements cannot be said to be untrue or materially
misleading").

The release did quote the Company's president
(Robinson) as stating that the Company had converted lithium to

---

[11] Similar logic applies to Arata's claim that LANXESS later disputed
Standard Lithium's December announcement of proof of concept.  The Hindenburg
Report quoted an unnamed LANXESS spokesperson as saying, in early 2022, that
there were "still some steps to go" for the LANXESS Project, and that LANXESS
and Standard Lithium would "see how we work together once proof-of-concept is
there."  *Id.* ¶¶ 190-91.  This did not falsify the December release.  The
LANXESS spokesperson never defined proof of concept or said that it required
a ninety-percent recovery rate.  And Arata does not allege that Standard
Lithium materially omitted to disclose any disagreement *by LANXESS* about
whether and how proof of concept was achieved.

"better than battery quality" on a "large scale." December Press Release 4. But "large scale" is definitionally vague, too. *See Sask. Healthcare*, 718 F. Supp. 3d at 385 (the word "large" is "to a large extent neither quantifiable nor factual, but rather subject to interpretation," and therefore not actionable). And the release included qualifying language that was more specific: it stated that the Demonstration Plant was operating at a "pre-commercial scale" and remained on the path "towards commerciali[z]ation." *Id.* ¶¶ 48-49 (emphases added).

3. Statements About Future LANXESS Project Performance

Arata next challenges Standard Lithium's statements about the future commercial performance of the LANXESS Project. Specifically, he challenges (1) the claim that the LANXESS Project was "scalabl[e]" or "economically viable," *see* Am. Compl. ¶¶ 121-22, 130-31, 150-51; and (2) the preliminary economic assessment's base case estimate — which Standard Lithium referenced in several financial disclosures — that the LANXESS Project would be worth just under $1 billion, which assumed (among other things) a recovery rate that "is about 90%." *Id.* ¶¶ 84-85; Preliminary Econ. Assessment 159. Importantly, the PEA did not say that the Demonstration Plant's recovery rate *was* ninety percent. Indeed, as noted above, Standard Lithium never suggested as much. Rather, the PEA

assessed what the LANXESS Project would be worth *if* the Project achieved that rate.

Statements concerning the future viability or performance of a resource extraction project are statements of opinion. *In re Pretium Res. Inc. Sec. Litig.*, 256 F. Supp. 3d 459, 477 (S.D.N.Y. 2017) (projections about gold mine's future performance were statements of opinion), *aff'd sub nom. Martin v. Quartermain*, 732 F. App'x 37 (2d Cir. 2018). So, to plead the falsity of those statements, Arata must allege that (1) "the supporting fact[s] [Standard Lithium] supplied were untrue," (2) "the speaker did not hold the belief [he or] she professed," or (3) "the speaker omit[ted] information whose omission [made] the statement misleading to a reasonable investor." *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016). The amended complaint contains no facts supporting the second pathway, so we focus on the first and third.

Arata has not adequately alleged falsity. His argument as to the first pathway hinges on Standard Lithium's alleged claim that the Demonstration Plant was achieving a ninety-percent recovery rate. And his argument as to the third pathway is that Standard Lithium omitted to mention the AOGC data undercutting the claim of a ninety-percent recovery rate. But as discussed above, *see* Part III.B.1.b, Standard Lithium never claimed the Demonstration Plant *was* achieving such a rate.

32

Instead, the PEA merely *assumed* such a rate for purposes of valuing the LANXESS Project, *see* Prelim. Econ. Assessment 159, while Standard Lithium's other disclosures said, based on lab-scale testing, that LiSTR "increases recovery efficiencies to as much as >90%." Am. Compl. ¶ 80; 2020 Annual Information Form 18-19. And even if the Company had much such a statement, Arata could not allege falsity merely by parroting the allegations in the Blue Orca Report. *See* Part III.B.1.c.

Arata's challenges to the PEA — which was incorporated into Standard Lithium's annual reports and other SEC filings — also fail under the PSLRA safe harbor and the bespeaks-caution doctrine. The safe-harbor provision forecloses liability for certain "forward-looking statements." 15 U.S.C. § 78u-5(c). It defines "forward-looking statement" to include any statement concerning the "objectives of management for future operations"; any statement of "future economic performance; and statements "of the assumptions underlying" those kinds of claim. *Id.* § 78u-5(i)(1). The safe-harbor provision shields a speaker from liability when the speaker's forward-looking statement is "accompanied by meaningful cautionary statements" indicating that "actual results [could] differ materially from those in the forward-looking statement," or "if the plaintiff fails to prove that the forward-looking statement was made or approved by an executive officer with actual knowledge by that officer that the

33

statement was false or misleading." *Slayton v. Am. Express Co.*, 604 F.3d 758, 762 (2d Cir. 2010).

Similarly, under the bespeaks-caution doctrine, "[a] forward-looking statement accompanied by sufficient cautionary language is not actionable because no reasonable investor could have found the statement materially misleading." *Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 141 (2d Cir. 2010). But "generic and mere boilerplate words of caution" do not suffice. *City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 301 (S.D.N.Y. 2013). Instead, the cautionary language must "directly relate to the risk that brought about plaintiffs' loss." *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002).

Here, the PEA valued the LANXESS Project at $989 million, based in part on the "assumption" — Arata's own word — that Standard Lithium "*could* achieve a lithium recovery of about 90%." Am. Compl. ¶¶ 39, 167, 168 (emphasis added). Arata contends that because this underlying recovery-rate assumption was wrong, the Company must have known that the valuation was also wrong, yet failed to tell investors as much. *Id.* ¶¶ 101, 137, 168, 169. But Standard Lithium's statements regarding the PEA contain ample cautionary language warning investors of the assumptions that went into the valuation — including as to recovery rate specifically — and the reasons why that valuation

34

might not be realized.  Standard Lithium informed investors that:

- "The [PEA] included herein are preliminary in nature . . ., and there is no certainty that the PEAs will be realized."  2021 Annual Information Form 6.

- "The final product lithium recovery is about 90%.  The production process parameters are supported by bench scale metallurgical testing and mini-pilot plant testing program results.  Readers are cautioned that statements relating to the production process and recovery are based on using a processing technology that has not yet been commercially proven and there is a risk that actual results, performance, prospects and opportunities could differ materially from those expressed or implied by such forward-looking information."  *Id.* at 15–20.

- "Exploring and developing natural resource projects bears a high potential for all manner of risks.  Additionally, few exploration projects successfully achieve development due to factors that cannot be predicted or foreseen.  Moreover, even one such factor may result in the economic viability of a project being detrimentally impacted, such that it is neither feasible nor practical to proceed."  *Id.* at 38.

- "[T]here can be no assurance that results obtained in small-scale laboratory tests, pilot plants or the Demonstration Plant will be duplicated in larger scale tests under on-site conditions or during production."  *Id.*

These and other cautionary statements explained the assumptions and risks to which the PEA was subject, including the very risks to which Arata now ascribes his losses.  *See Martin*, 732 F. App'x at 42 (mining company's estimates were non-actionable where company "emphasized the preliminary nature of its development" and warned that its assessment "may ultimately

prove to be inaccurate"). The statements about the PEA therefore fall within the safe harbor and the bespeaks-caution doctrine.

    4.   <u>Statements About Proprietary or Novel Technology</u>

       Finally, Arata challenges statements that Standard Lithium had developed "proprietary" and "novel" technologies for directly extracting lithium. *See, e.g.*, Am. Compl. ¶¶ 94, 113. These statements were false, he says, because the technology was only "based on three patent applications [Standard Lithium] purchased in December 2018 from a one-man engineering shop," and because the Patent and Trademark Office had denied patent protection to LiSTR on the ground that it was insufficiently novel. *E.g.*, *id.* ¶ 159.

       At the outset, the provenance of the LiSTR patent applications says nothing about their novelty or value. A patent application bought from a "one-man engineering shop" could just as easily transform an industry as one bought from a commercial-scale research laboratory. In any event, Standard Lithium did clearly disclose the origins of the LiSTR patent applications in its 2020 annual report to shareholders, and therefore cannot have misled its investors about them. *In re Curaleaf Holdings, Inc. Sec. Litig.*, 519 F. Supp. 3d 99, 107 (E.D.N.Y. 2021) ("[D]ismissal is appropriate where the complaint

is premised on the nondisclosure of information that was actually disclosed."); *see* 2020 Annual Information Form 11.

Furthermore, Standard Lithium's use of the word "proprietary" was not plausibly false or misleading, notwithstanding the prior rejection of the patent application. "[T]he legal definition of proprietary technology is broader than simply holding a patent . . . ." *Tabor v. Bodisen Biotech, Inc.*, 579 F. Supp. 2d 438, 451 (S.D.N.Y. 2008). The word simply means "[o]f, relating to, or holding as property." *Proprietary*, Black's Law Dictionary (12th ed. 2024). Arata does not dispute that Standard Lithium owns the rights to the LiSTR technology, so he cannot claim that Standard Lithium inaccurately described it as "proprietary."

Standard Lithium's use of the word "novel" also was not plausibly false or misleading. Arata relies mainly on the fact that LiSTR was denied patent protection on novelty grounds. *E.g.*, Am. Compl. ¶ 159.[12] But a product can be novel without being novel *enough* to receive a patent. *Udin v. J. Kaufman Iron Works, Inc.*, 342 F. Supp. 1090, 1095 (S.D.N.Y. 1972) ("An invention which has been made, and which is new in the sense

---

[12] Arata also relies on the Hindenburg Report's conclusion, based on conversations with unnamed "industry sources," that LiSTR was not a novel technology. Pl.'s Opp'n Br. 24; Am. Compl. ¶ 76. But there is no evidence that Arata independently validated those anonymous sources' claims, so the Court will not rely upon them. *See Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 804 (S.D.N.Y. 2020) (refusing to credit statements in short-seller report attributed to "anonymous interviewees" absent any independent corroboration by counsel).

that the same thing has not been made before, may still not be patentable if the difference between the new thing and what was known before is not considered sufficiently great to warrant a patent." (emphasis omitted)). Thus, the alleged non-patentability of LiSTR says nothing about the truth of Standard Lithium's assertions of novelty. In addition, the statement that LiSTR was a "novel" breakthrough in lithium extraction was subjective, and therefore non-actionable. *See, e.g.*, *Yan v. ReWalk Robotics Ltd.*, 973 F.3d 22, 32 (1st Cir. 2020) (claim of "breakthrough" medical device was puffery); *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 173 (3d Cir. 2014) (claim of "breakthrough drug" was puffery).

**C.    Scienter**

Dismissal is also appropriate as to the individual defendants because Arata fails to raise a "strong inference" of scienter. *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000). Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 319 (2007). An inference of scienter is strong only when it is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 314. To raise a strong inference, a complaint must "state with particularity facts" showing (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial

evidence of conscious misbehavior or recklessness. *ECA, Loc. 134 IBEW Joint Pension Tr. v. JP Morgan Chase Co.*, 553 F.3d 187, 197-98 (2d Cir. 2009). Against this extremely strict legal landscape, Arata has not made either showing.

1. <u>Motive</u>

Arata has not adequately alleged a specific motive to defraud investors. In general, plaintiffs may not rely on "motives possessed by virtually all corporate insiders," such as the desire to maintain a high stock price "in order to increase executive compensation or prolong the benefits of holding corporate office." *Novak*, 216 F.3d at 307. Instead, they must "allege that defendants benefitted in some *concrete and personal* way from the purported fraud." *Id.* at 307-08 (emphasis added). The "ordinary" example of adequate motive is the "desire to profit from extensive insider sales." *Id.* at 308.

Here, the complaint does not allege that the individual defendants realized any concrete and personal benefit from the alleged fraud, such as the sale of their own shares of stock. *See In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 372 (E.D.N.Y. 2013) ("Typically, a plaintiff must show that officers made false statements in order to sell their own shares at a profit."). Instead, Arata primarily alleges that the defendants "were motivated to issue materially false and misleading statements so that Standard Lithium could raise cash at inflated

39

levels to infuse much needed funds into the Company" based on
Standard Lithium's need for fundraising to remain a going
concern.  Am. Compl. ¶ 194; *see also id.* ¶¶ 192-96.  But the
need to raise capital and stave off a company's collapse is the
type of generalized motive that is insufficient to allege
scienter.  *In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d
510, 532-33 (S.D.N.Y.) (collecting cases), *aff'd sub nom. Condra
v. PXRE Grp. Ltd.*, 357 F. App'x 393 (2d Cir. 2009); *see also
Tabak v. Canadian Solar Inc.*, 549 F. App'x 24, 28-29 (2d Cir.
2013).

       2.   <u>Conscious Misbehavior or Recklessness</u>

      Arata also has not adequately alleged that the
defendants' actions constituted conscious misbehavior or
recklessness.  When a complaint has "failed to demonstrate" an
adequate motive to defraud, it "must produce a stronger
inference of recklessness," and "the strength of the
circumstantial allegations must be correspondingly stronger."
*Kalnit v. Eichler*, 264 F.3d 131, 142-43 (2d Cir. 2001).[13]
Reckless conduct means "conduct which is highly unreasonable and
which represents an extreme departure from the standards of

---

[13] While the applicable standard involves "conscious misbehavior *or*
recklessness," the case law treats the two terms as synonymous.  *See, e.g.,
In Re Carter-Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000) ("To
survive dismissal under the 'conscious misbehavior' theory, the appellants
must show that they alleged reckless conduct by the appellees ...."); *Kalnit
v. Eichler*, 85 F. Supp. 2d 232, 243 n.5 (S.D.N.Y. 1999) ("Although courts
often refer to 'conscious misbehavior' or 'recklessness,' the terms appear to
be legally interchangeable.").

ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Novak*, 216 F.3d at 308.  That is, a plaintiff must allege that the defendant acted with "a state of mind approximating actual intent, and not merely a heightened form of negligence." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 106 (2d Cir. 2015).

Arata alleges that the individual defendants "knew" their statements were false "[b]ecause of their positions with Standard Lithium, and their access to material information." Am. Compl. ¶¶ 26, 182.  But "conclusory allegations that a corporate officer had access to information that contradicted the alleged misstatements are insufficient to raise a strong inference of recklessness." *Kinsey v. Cendant Corp.*, No. 04-CV-582, 2005 WL 1907678, at *5 (S.D.N.Y. Aug. 10, 2005) (collecting cases).

The complaint's allegation that the individual defendants had knowledge of the fraud because it "concerned Standard Lithium's core operations," Am. Compl. ¶ 183, fares no better.  Under the "core operations" theory, "a court may infer that a company and its senior executives have knowledge of information concerning the core operations of a business, such as events affecting a significant source of revenue." *In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*, 529 F. Supp.

3d 111, 174 (S.D.N.Y. 2021).  This theory, however, may provide only "supplemental support for an inference of scienter."  *Id.* It is not "independently sufficient to raise a strong inference of scienter."  *Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 37 (S.D.N.Y. 2019).  The plaintiff still must "have adequately alleged facts indicating that defendants might have known their statements were false or inaccurate."  *Id.* at 38.

Under either theory, Arata's arguments for scienter hinge on Standard Lithium's disclosure of data to the AOGC that allegedly contradicted its public statements.  Am. Compl. ¶¶ 186-88.  But the fact that Standard Lithium submitted this data to a public entity with knowledge that it would be publicly available (at least in some form) undercuts — rather than bolsters — any inference of scienter.  *See In re Pretium Res. Inc. Sec. Litig.*, No. 18-CV-8199, 2020 WL 953609, at *6 (S.D.N.Y. Feb. 27, 2020) ("Given that the waste rock data would ultimately become available to the public, Defendants had virtually no incentive to disclose conflicting data to investors . . . ."); *see also Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 593 (S.D.N.Y. 2011) ("It defies reason that an entity looking to profit on a fraudulently inflated stock price would hold close to ninety percent of its shares as share prices fell, *while*

42

*knowing that the information illuminating the fraud was seeping into the market*.").

## D.   Section 20 Claims Against Individual Defendants

The plaintiff also brings claims against Mintak, Norman, and Robinson under Section 20 of the Exchange Act, which establishes liability for individuals exercising control over "any person liable" under that statute or any rule or regulation promulgated pursuant thereto. 15 U.S.C. § 78t(a). To establish a *prima facie* case under Section 20(a), a plaintiff must show: "(1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful sense a culpable participant in the primary violation." *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998).

Because Plaintiff has failed to allege any misstatements or omissions by Standard Lithium or the individual defendants that survive a motion to dismiss — in other words, a primary violation — the Section 20 claims against Mintak, Norman, and Robinson must also be dismissed. *See ECA*, 553 F.3d at 206-07 (affirming dismissal of Section 20 claims "for want of a primary violation").

## IV.  Conclusion

For foregoing reasons, the defendants' motion to dismiss the amended complaint is granted.  The Clerk of Court is respectfully directed to enter judgment and close this case.


SO ORDERED.


<u>    /s/ Eric Komitee            </u>
ERIC KOMITEE
United States District Judge


Dated:    September 28, 2025
          Brooklyn, New York